# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA RAY, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-04378 |
| | : | |
| MICHAEL J. ASTRUE, COMMISSIONER | : | |
| OF SOCIAL SECURITY, | : | |
| Defendant. | : | |
| | : | |

## Memorandum

YOHN, J.                                                                    January 7, 2009

Plaintiff, Theresa Ray, appeals the decision of the Social Security Commissioner ("Commissioner") that denied Ray's application for widow's insurance benefits ("WIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 301 *et seq.* (2006). The Commissioner determined that Ray was capable of employment in the national economy, thus not disabled, and not entitled to WIB or SSI. Ray appealed, and the court referred the matter to a magistrate judge, who issued a Report and Recommendation ("R&R") in favor of granting in part and denying in part Ray's appeal and remanding the case for further review. The Commissioner objects to the R&R. For the following reasons, the court will adopt in part the conclusions of the magistrate judge and remand the case for further decisions consistent with this memorandum.

## I.      Facts and Procedural History

On September 22, 2005, Ray applied for WIB and SSI claiming that she had a disability beginning on or about January 1, 2004. (R. 13, 44-55, 118-20; R&R 1.) Ray claimed she suffered from high blood pressure, arthritis, and a swollen stomach. (R. 13, 56; R&R 1.)

Following a disability determination report from a state adjudicator, the Social Security

Administration denied both applications, but later granted Ray, who obtained representation, a

hearing to appeal both decisions.  (R. 25-43, 121-25; R&R 1.)  Eleven days after her April 12,

2007 hearing, where only Ray and a Vocational Expert ("VE") testified, the presiding

administrative law judge ("ALJ") denied Ray's appeal because he found that given Ray's

condition she could obtain employment in the national economy and thus did not qualify as

disabled.  (R. 10-24, R&R 2.)  When the Social Security Appeals Council denied Ray's request

for review on August 17, 2007, the ALJ's findings became the final decision of the

Commissioner.  (R. 6-11; R&R 2.)

To reach the final decision denying Ray disability benefits, the Commissioner relied on

information about Ray from a variety of sources: Ray's application for disability benefits, Ray's

medical records, the state disability examiner's report, a report from Dr. Nicholas Diamond, and

testimony from Ray and the VE.  (R. 13-24; R&R 2-6.)

### A.    Ray's Application Materials

In her application materials,[1] Ray, born September 18, 1955, claimed that she had a

twelfth grade education, lived with her daughter, and never previously worked.  (R. 16, 19, 44,

60, 118; R&R 2.)  Ray is five and one-half feet tall and weighs approximately 210 pounds.[2]  Ray

---

[1]  Application materials include: Ray's application for WIB benefits, her application for
SSI benefits, a Disability Report - Adult (Form SSA-3368), a Field Office Disability Report
(Form SSA-3367), a Disability Report - Appeal, and an Activities of Daily Living form.  (R. 44-
79, 118-20.)

[2]  Reports of Ray's weight from the doctors who treated her at the clinic she visits range
from 207 to 218.  (R. 80-109.)  Dr. Diamond, who evaluated Ray's physical abilities, listed her as
weighing 208 pounds.  (R. 113.)  At one point, the ALJ noted she weighed 206 pounds, (R. 20) at
another 230, (R. 19).

complained of her joints "locking" and of constant and unbearable pain throughout her body, particularly in her joints, including her hands, back, knees, and feet.  (R. 73-79.)  This pain gives her trouble sleeping, and medicine provides no relief.  (R. 19, 70, 73-79.)  Ray reported that she cannot cook or clean, but sometimes can do laundry; as a result, she sometimes relies on help from her daughter.  (R. 19, 73-79.)  She stated that she cannot carry anything weighing more than eggs and bread.  (R. 73-79.)  She also stated that she cannot shower standing up or dress herself and cannot go up stairs more than once per day.  (*Id.*)  In response to an application question about prolonged sitting, she responded that she is "comfortable sitting."  (R. 75.)  Ray cannot walk any farther than about a city block before her knee and back pain cause her to stop.  (R. 78.)  Ray reported taking these medications: Imitrex[3] (for headaches), Celebrex[4] (for arthritis), and Avalide[5] (for high blood pressure).  (R. 68.)  Ray applied for WIB through her husband, a commercial vehicle driver, who passed away on May 4, 1997.  (R. 13, 44.)  She applied for SSI benefits on behalf of herself.  (R. 118-20.)

### B.    Ray's Medical Records

Ray's medical records consist mostly of one page filled-in forms of treatment notes for each of her apparently bi-monthly visits to a Delaware Valley Community Health clinic ("clinic") from October 24, 2004 to September 18, 2006.  (R. 19, 80-109; R&R 3.)  These forms do not list a particular physician's name, but at least two different signatures appear on the forms included

---

[3]  Imitrex is used for the "acute treatment of migraine attacks."  *Physicians' Desk Reference* 1469 (62d ed. 2008).

[4]  Celebrex treats arthritis, osteoarthritis, and acute pain.  *Id.* at 3066.

[5]  Avalide is used "for the treatment of hypertension."  *Id.* at 881.

in the record.  (*Compare* R. 80-83, 109-09 *with* R. 84-93.)  Each form contains both a completed checklist form of physical symptoms and a diagnosis of the patient's condition.  (R. 19, 80-109.) Every form includes a notation about Ray's high blood pressure, but only some forms refer to Ray's joint pain or related diagnoses.  (R. 19, 80-109; R&R 3.)  The treatment notes also contain at least one of each of these diagnoses: arthritis[6] (October 8, 2005; August 17, 2004); fibromyalgia[7] (September 3, 2004); arthralgia[8] (October 24, 2005; August 8, 2005); bilateral carpal tunnel syndrome[9] (February 7, 2005; December 7, 2004; October 21, 2004); and back pain (June 19, 2006).  (R. 19, 80, 81, 83, 86-90, 107; R&R 4.)  On two other occasions, Ray reported back pain and arthritis pain.  (R. 107, 109; R&R 4.)

On several occasions, the notes include a diagnosis of arthritis or a similar condition, but not a check in the appropriate box on the form to indicate a musculoskeletal abnormality.  (*See, e.g.*, R. 80, 81, 83, 88, 107.)  Other times the diagnosis of arthritis and the physical exam checklist correspond.  (*See, e.g.*, R. 85-87, 90.)  Ray reported rating her pain as at least a five, on a scale of one to ten, at all but two clinic visits from September 3, 2004 through March 21, 2006. (R. 80-89, 108-09.)  At two visits, December 7, 2004 and February 7, 2005, the treating

---

[6]  Arthritis is a condition marked by "inflammation of a joint."  *Dorland's Medical Dictionary* 152 (31st ed. 2007).

[7]  Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points."  *Id.* at 711.

[8]  Arthralgia refers to "pain in a joint."  *Id.* at 152.

[9]  Bilateral carpal tunnel syndrome refers to "compression of the median nerve as it passes through the carpal tunnel in the wrist," and the condition causes pain or other discomfort in the hand.  Mark H. Beers, MD, et al., *The Merck Manual* 334 (18th ed. 2006).

4

physician recommended that Ray have an electromyography[10] and a nerve conduction velocity

test,[11] once Ray obtained insurance.  (R. 86, 87.)  Throughout the course of her treatment, Ray

received several prescriptions for pain medication: Percoset[12] (June 19, 2006); Celebrex (October

24, 2005; August 8, 2005); Vicodin and Skelaxin[13] (October 24, 2004); and Bextra[14] (August 17,

2004).  (R. 80, 83, 88, 90, 107; R&R 4.)

### C.    Review by state disability examiner

On November 1, 2005, state disability examiner Joseph Saita determined that Ray did not

have a disability based on his assessment of Ray's work-related abilities, also called her residual

functional capacity ("RFC"), but he did diagnose Ray as having hypertension and arthralgia.  (R.

22, 26, 100-05, 121; R&R 5.)  On a checklist form of exertional imitations, Saita noted that Ray

could: occasionally lift up to fifty pounds; frequently carry up to twenty-five pounds; and stand,

---

[10]   An electromyography records electrical impulses from a muscle while it is contracting and resting to determine the cause of a patient's weakness—nerve, muscle, or neuromuscular junction.  *Id.* at 1758.

[11]   In a nerve conduction velocity test, the time between an administration of the electrical stimulus to a patient and the resulting muscle contraction is recorded to determine how fast the patient's nerves conduct neural impulses.  *Id.*

[12]   Percoset is used "for the relief of moderate to moderately severe pain."  *Physicians' Desk Reference*, *supra*, at 1126.

[13]   Vicodin is used "for the relief of moderate to moderately severe pain."  *Id.* at 510. Skelaxin is used "for the relief of discomforts associated with acute, painful musculoskeletal conditions."  *Id.* at 1753.

[14]   Bextra is used for the "relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis."  Letter from Brian Harvey, Center for Drug Evaluation and Research, Food and Drug Administration, to Kevin Phelan, Regulatory Affairs, Pfizer, Inc. 9 (Nov. 24, 2004), *available at* http://www.fda.gov/cder/foi/label/2004/21341lbl.pdf.  "Bextra was withdrawn from the U.S. market in 2005."  Drugs.com, Bextra, http://www.drugs.com/bextra.html (last visited Dec. 1, 2008).

walk, or sit for up to six hours of an eight hour workday.  (R. 22, 101; R&R 5.)  He noted no

other limitations.  (R. 102-04.)  Based on the "character and nature" of Ray's symptoms, Ray's

"unremarkable" physical exam, the "routine and conservative" treatment Ray received, and Ray's

range of motion, which was "within normal limits," Saita found Ray's claims of disability

"partially credible."  (R. 105.)

     **D.**     **Review by Dr. Nicholas Diamond**

     At the advice of her attorney, Ray received a disability evaluation, including a medical

source statement, from Dr. Nicholas Diamond on March 30, 2007.  (R. 20, 110-17; R&R 4.)  Dr.

Diamond conducted range of motion and other testing for all of Ray's major joints.  (R. 20, 110-

117; R&R 4.)  Following this exam, Dr. Diamond presented his findings in a detailed, written

assessment and completed a checklist of Ray's work-related physical abilities, essentially her

RFC.  (R. 20, 110-17; R&R 4.)  Dr. Diamond observed that Ray walked with a limp,

occasionally used a cane, and had trouble with heel and toe walking, but had no trouble getting

on and off the examination table.  (R. 20, 113; R&R 4.)  Dr. Diamond noted that Ray had limited

mobility and pain in her spine, shoulders, left hip, knees, and left wrist.  (R. 20, 114-15; R&R 4.)

Although in her right hand Ray had no abnormalities or decreased functionality, in her dominant

left-hand she had tenderness and markedly reduced grip strength.  (*Id.*)  The left hand also

suffered from deQuervain's Syndrome,[15] a condition marked by pain in the wrist and thumb from

certain movements.  (R. 20, 114-15; R&R 4-5); *see also* Beers, *supra* note 9, at 336 (describing

_____

     [15]  To detect deQuervian's syndrome, physicians typically use the Finkelstein test, in
which the patient places the thumb in the palm of the hand, wraps the fingers over the thumb, and
bends the wrist toward the little finger; if the test causes the patient pain, the patient has
deQuervian's syndrome.  Beers, *supra* note 9, at 336.  Ray had a positive Finkelstein test.  (R.
15.)

deQuervain's Syndrome).  Dr. Diamond noted that although Ray's sitting root test was negative,

Ray's straight leg raise was positive past sixty and thirty degrees of motion in the right and left

legs respectively.  (R. 20, 114.)  This testing meant Ray had some sciatic or lumbar nerve pain.[16]

Dr. Diamond found an abnormal inward angling of both of Ray's knees,[17] but no weakness or

damage to Ray's medial collateral ligament.[18]  (R. 20, 115.)  Nevertheless, Dr. Diamond

observed that Ray had "difficulty squatting or kneeling."  (*Id.*)

Dr. Diamond diagnosed Ray with: post-traumatic osteoarthritis, non-traumatic

polyarthralgias, chronic pain syndrome, left index trigger finger, type II diabetes mellitus, and

hypertension.  (R. 20, 116; R&R 5.)  He considered Ray's prognosis poor.  (*Id.*)  According to his

assessment of Ray's RFC, Ray could: lift or carry no more than two to three pounds occasionally;

stand or walk for no more than one to two hours of an eight hour workday; and sit for no more

than three hours of an eight hour workday.  (*Id.*)  Dr. Diamond also determined that Ray could

not perform any bending, kneeling, stooping, crouching, balancing, or climbing.  (R. 111; R&R

---

[16]  To test for sciatica, orthopaedists typically use the straight leg raise, in which the patient lies on her back and the physician lifts one leg, keeping it straight, while holding the other leg flat on the floor.  David J. Magee, *Orthopedic Physical Assessment* 559-64 (5th ed. 2008).  If at any time during the test, the patient experiences any leg or back pain, then the test is positive. *Id.* at 559-61.

[17]  Dr. Diamond found that both of Ray's knees exhibited genu valgus, (R. 115), "a deformity in which the knees are abnormally close together and the space between the ankles is increased," *Dorland's Medical Dictionary* 782.

[18]  Dr. Diamond performed valgus and varus stress tests, (R. 115), which test lateral movement in the knee joint to detect a rupture or sprain of the medial collateral ligament.  Stuart L. Weinstein, Samuel L. Turek & Joseph A. Buckwalter, *Turek's Orthopaedics* 597 (5th ed. 2005); *see also* Christian Veillette and Jospeh Bernstein, Orthopaedia, Valgus Stress Test of the Knee, http://www.orthopaedia.com/display/Main/Valgus+stress+test+of+the+knee (last visited Dec. 1, 2008) (describing valgus stress test and its significance; providing link to similar discussion of varus stress test).

5.)  He found Ray had limited capability for reaching, handing, fingering, and feeling.  (*Id.*)

     **E.**     **Ray's Testimony at the Hearing Before the ALJ**

At her hearing, Ray testified in response to questions from the ALJ and her attorney.  (R. 137-54; R&R 3.)  Ray attributed her inability to work to: her arthritis, her lack of education, her back, her occasional inability to walk, the occasional failure of her knees, and her inability to use her left hand—especially to lift items.  (R. 19, 142-44; R&R 3.)  To justify her disability claim, Ray discussed her medical condition and her daily living conditions.  (R. 137-54; R&R 3.)

Ray stated that medication controls her hypertension, but her diabetes fluctuates, despite medication.  (R. 17, 141; R&R 3.)  For her physical pain from arthritis, headaches, and other conditions, Ray testified that she only takes Tylenol because she does not "want to mix too many medicines."  (R. 140, 144, 149.)  Ray testified that she visits the Delaware Valley Community Health clinic once per month to obtain her medications, but does not receive a physical examination at every visit.  (R. 140, 148.)  She also said the clinic often fails to produce a complete written record of every visit.  (R. 140, 143, 148, 150.)  Ray stated that the clinic wanted to conduct diagnostic tests related to her joint and arthritic pain, but could not do so because Ray lacked insurance.  (R. 144, 148.)

Ray also testified about her physical limitations.  Ray does not cook or clean, but does her own laundry.  (R. 19, 146; R&R 3.)  Ray stated that because of her back, she cannot sit too long and needs to get up for five minutes after every fifteen to twenty minutes of sitting.  (R. 145-47; R&R 3.)  Ray testified she needs a cane to walk, but she did not have it with her when she testified.  (R. 139.)  Even so, she said she cannot walk more than a block.  (R. 147; R&R 3.)  Ray claimed she can lift no more than five pounds.  (R. 19, 143, 144-45.)  About twice per week, Ray

8

suffers from a severe headache that requires her to lie down with a cold towel on her head.  (R.

17, 148, 150; R&R 3.)  Ray spends her days seated in bed or on her recliner watching television,

and she only ventures out of her home with her daughters.  (R. 19, 149; R&R 3.)

F.    **Vocational Expert Testimony**

A vocational expert testified about Ray's ability to work in the national economy.  The

VE assumed Ray has the RFC for light unskilled work,[19] and based on her education, age, and

work experience, the VE identified several jobs in the national economy that Ray could perform:

cashier, locker room attendant, and office helper.  (R. 23, 150-51; R&R 5-6.)  The VE conceded

that if Ray had an RFC for only sedentary work,[20] Ray would not be capable of any type of full-

time work.  (R. 23, 151; R&R 6.)

---

[19]  According to classifications of work-related physical exertion requirements in Social
Security Administration regulations, light work involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying
> of objects weighing up to 10 pounds.  Even though the weight lifted may
> be very little, a job is in this category when it requires a good deal of
> walking or standing, or when it involves sitting most of the time with
> some pushing and pulling of arm or leg controls. To be considered
> capable of performing a full or wide range of light work, [a person] must
> have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b); *see also* 20 C.F.R. § 416.967(b).

[20]  Sedentary work involves:

> lifting no more than 10 pounds at a time and occasionally lifting or
> carrying articles like docket files, ledgers, and small tools.  Although a
> sedentary job is defined as one which involves sitting, a certain amount
> of walking and standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required occasionally and
> other sedentary criteria are met.

20 C.F.R. § 404.1567(a); *see also* 20 C.F.R. § 416.967(a).

9

### III.    Administrative Law Judge's Findings

Following the hearing, the ALJ determined that Ray satisfied the preliminary, non-disability requirements for obtaining both WIB and SSI benefits.  As to Ray's disability status, the ALJ made these relevant findings:

> 4.  Claimant has the following severe combination of medically determinable impairments: osteoarthritis of the back, knees, and left wrist; polyarthralgias; chronic pain syndrome; and obesity (20 CFR 404.1520(c) and 416.920(c)).
>
> 5.  Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 6.  After careful consideration of the entire record, the undersigned finds that claimant  has the residual functional capacity to perform light exertional work, including lifting/carrying or pushing/pulling up to 10 pounds frequently and 20 pounds occasionally, and sitting, standing and/or walking about 6 hours per 8-hour workday with normal breaks.  She is limited to occasional postural activities (climbing, balancing, stooping, kneeling, crouching, or crawling), but has no other non-exertional limitations.
>
> *  *  *
>
> 8.  Claimant was born on September 18, 1955, and attained age 50, i.e., an individual closely approaching advanced age, on September 17, 2005. . . .
>
> 9.  Claimant has a limited (11th grade) education, and is able to communicate (read, write, understand, speak) in English (20 CFR 404.1564 and 416.964).
>
> 10.   Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 404.1568 and 416.968).
>
> 11.   Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).
>
> 12.   Claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2004, through the date of this decision (20 CFR

10

404.1520(g) and 416.920(g)).

(R. 16-24.)

## IV.   Legal Standard

### A.   Standard of Review

A district court reviews de novo the parts of the magistrate judge's report and recommendation to which the Commissioner objects.  28 U.S.C. § 636(b)(1) (2006).  The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations.  *Id.*  In contrast, a district court may not review the ALJ's decision de novo. The court may only review the ALJ's final decision to determine "whether that decision is supported by substantial evidence."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552 (1988).  Substantial evidence ranges from "more than a mere scintilla of evidence [to] . . . less than a preponderance."  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

In making this determination, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding."  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *see also Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999) ("To determine whether a finding is supported by substantial evidence, we must review the record as a whole." (citing 5 U.S.C. § 706 (2006)).  Nevertheless, the substantial evidence test is "deferential."  *Monsour*, 806 F.2d at 1190.  Thus, the court may not "weigh the evidence," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), and "will

11

not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently," *Hartranft*, 181 F.3d at 360.

### B.   Disability determination

#### 1.   Relevant Standards

To qualify for WIB or SSI disability insurance payments, a claimant must have a disability.  42 U.S.C. § 423(a)(1) (2006).  A disability means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A); *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987) (finding that claimant must demonstrate "there exists a medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period").  A person has a disability when the person's

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.[21]

*Id.* § 423(d)(2)(A).  For the Commissioner to find that a person has a disability, the person must "furnish[] such medical and other evidence of the existence" of a disability, including "[o]bjective medical evidence of pain or other symptoms established by medically acceptable

---

[21]  The existence of gainful work does not include considerations of "whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

clinical or laboratory techniques."[22]  *Id.* § 423(d)(5)(A).

When evaluating a claim for SSI disability payments, the Commissioner applies a five-step sequential analysis: (1) whether the claimant worked during the alleged period of disability, (2) whether the claimant has a "severe medically determinable . . . impairment," (3) whether the "impairment" meets the requirements of a listed impairment, (4) whether the claimant can continue to perform "past relevant work," and (5) whether the claimant can perform "other work" in the national economy.  20 C.F.R. §§ 404.1520(a)(4) (2008), 416.920(a)(4) (2008); *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000).  The claimant bears the burden of proving steps one through four.[23]  If the claimant satisfies these requirements, the burden of

---

[22]  In relevant part, the statute states:

> An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.  An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.  Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability . . . .

*Id.* § 423(d)(5)(A).

[23]  Technically, neither party bears the burden of proving step three "[b]ecause step three involves a conclusive presumption based on the listings."  *Sykes*, 228 F.3d at 263 n.2.

production shifts to the Commissioner to show that the claimant is capable of performing "other work." *Sykes*, 228 F.3d at 263; *see also Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (noting burden of production shifts to Commissioner at step five).

The fifth step involves a two-part analysis. First, the Commissioner must assess the claimant's present job qualifications based on the claimant's physical ability, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (citing regulations). Next, based on the claimant's qualifications, the Commissioner must identify what jobs exist in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Mason*, 994 F.2d at 1064 (citing regulations).

As part of the step five analysis, the Commissioner must assess the claimant's RFC, a measure of what the claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R §§ 404.1545(a)(1), 416.945(a)(1). The Commissioner need not accept any opinion that reaches a conclusion about the claimant's RFC, because RFC constitutes an "administrative finding[] . . . dispositive of a case" and thus falls within the scope of "issues reserved to the Commissioner." 20 C.F.R. §§ 404.1527(e), 416.927(e). Sill, in assessing RFC, the Commissioner can consider "all of the relevant medical and other [non-medical] evidence," including medical evaluations, statements of abilities, and descriptions of the claimant's subjective symptoms from the claimant and others, including medical personnel. *Id.* §§ 404.1545(a)(3), 416.945(a)(3); *see also Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121-23 (3d Cir. 2000) (assessing medical and non-medical evidence to determine RFC).

As to a claimant's alleged "subjective symptoms," including pain, they "must be

14

supported by objective medical evidence." *Hartranft*, 181 F.3d at 362; *see also* 20 C.F.R. §

404.1529(a) ("[T]here must be medical signs and laboratory findings[, i.e. objective medical

evidence,] which show that you have a medical impairment."); 20 C.F.R. § 416.929(a) (same).

In giving evidentiary weight to these symptoms, the Commissioner first determines whether a

medically determinable impairment could reasonably be expected to produce the claimant's

symptoms. *Id.* §§ 404.1529(b), 416.929(b). Next, the Commissioner evaluates the intensity,

persistence, and limiting effects of those symptoms to determine the extent to which those

symptoms actually limit the claimant's capacity for work. *Id.* §§ 404.1529(c), 416.929(c). In

making this evaluation the Commissioner looks at the consistency of the subjective symptoms

with first the objective medical evidence and then the non-medical evidence.[24] *Id.* §§

404.1529(c)(4), 416.929(c)(4).

### 2.    Application of standards to Ray

In determining whether Ray had a disability, the ALJ performed the requisite five-step

analysis. The parties do not dispute the first four steps: (1) Ray has not engaged in substantial

gainful activity in any relevant time period; (2) Ray has a severe combination of medically

determinable impairments, specifically polyarthralgias, chronic pain syndrome, obesity, and

osteoarthritis of the back, knees, and left wrist; (3) Ray's impairments do not qualify as a listed

impairment that would make her per se disabled; and (4) Ray cannot return to any past relevant

work because she has no past relevant work. (R. 16-20, 22.)

---

[24] Non-medical evidence can include: the claimant's daily activities; the circumstances of
the claimant's symptoms, including location, duration, frequency, intensity, and precipitating and
aggravating factors; medication and other treatments for the symptoms; and medical and non-
medical measures taken to relieve the symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

For step five in the disability assessment, the ALJ made the requisite two-part inquiry, beginning with Ray's present job qualifications.  (R. 21-24.)  Turning to Ray's RFC, the ALJ found that Ray could perform light exertional work, which could include: (1) frequent lifting of ten pounds; (2) occasional lifting of twenty pounds; (3) sitting, standing, walking, or a combination of those for six hours of an eight hour workday; and (4) only occasional climbing, stooping, kneeling, crouching, or crawling.  (R. 21-22.)

In making this RFC determination, the ALJ found that a medically determinable impairment could reasonably produce the symptoms Ray complained of both in her testimony and in reports from treating physicians and other medical examiners.  (R. 10.)  As to the extent to which those symptoms limited Ray's ability to work, the ALJ considered whether Ray's "symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone."  (R. 21.)  Based on this view of the medical evidence, along with the entire case record, the ALJ found that Ray's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not entirely credible."  (R. 22.)  The ALJ then used this credibility finding to determine Ray's RFC (light exertional work).  (*Id.*)  Based on this RFC, Ray's eleventh grade education,[25] and her lack of work experience, the VE confirmed the existence of corresponding available jobs in the national economy.  (R. 22-23.)  Therefore, the ALJ concluded that Ray was not disabled and not entitled to WIB or SSI benefits.  (*Id.*)

Presently, the crux of the parties' dispute concerns how the ALJ weighed the medical evidence regarding the severity of Ray's impairments and how this weighing affected the ALJ's

---

[25]  Ray testified that her education ended in the eleventh grade and that her daughter mistakenly wrote twelfth grade on her application.  (R. 139.)

determination of Ray's RFC and thus his final decision.  Therefore, to address that dispute and

whether the ALJ supported its final disability decision with substantial evidence, the court must

review the standards governing how an ALJ must weigh evidence.

### C.    Weight of Evidence

"The ALJ has a duty to hear and evaluate all relevant evidence . . . to determine whether

an applicant is entitled to disability benefits."  *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.

1981).  In particular, the ALJ has the dual responsibility of "developing an administrative record"

and of "explicitly weighing all [competent] evidence."  *Dobrowolsky v. Califano*, 606 F.2d 403,

406-07 (3d Cir. 1979); *see Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (The ALJ has "a

duty to develop a full and fair record in social security cases."); *Schaudeck*, 181 F.3d at 435

("ALJ must explicitly weigh [competent] evidence").  "Where the [ALJ] is faced with conflicting

evidence, he must adequately explain in the record his reasons for rejecting or discrediting

competent evidence."  *Benton for Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987).  Although

the ALJ has "statutory authority to choose [which evidence] to credit" among conflicting

evidence, "the ALJ cannot reject evidence for no reason or the wrong reason."  *Mason*, 994 F.2d

at 1066 (quotation and citation omitted); *see Plummer*, 186 F.3d at 429 (citing *Mason*).  The

Third Circuit has emphasized that the ALJ must provide these explanations for only "pertinent or

probative evidence," because "[o]verwhelming evidence in the record" can render other evidence

"irrelevant" and thus not worthy of the ALJ's explanation of its disregard.  *Johnson v. Comm'r of*

*Soc. Sec.*, 529 F.3d 198, 203-04 (3d Cir. 2008).

Specifically, for RFC determinations, the ALJ must explain how he considered and

resolved "any material inconsistencies or ambiguities in the evidence in the case record."  Policy

Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, S.S.R. 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996).  Furthermore, the ALJ must explain how reported, symptom-related, functional limitations and restrictions, such as reaching and grasping, are consistent or not with the evidence in the record.  *Id.*  "Moreover, the ALJ's finding of residual functional capacity must be accompanied by a clear and satisfactory explication of the basis on which it rests."  *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001) (citation and quotation omitted).

If the ALJ does not provide these reasons for rejecting certain evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored" and cannot tell if the ALJ supported the decision with substantial evidence.  *Cotter*, 642 F.2d at 705.  Thus, the ALJ's "bare conclusion [lies] beyond judicial review" or, at best, lacks substantial evidence. *Burnett*, 220 F.3d at 119 (quotation and citation omitted).  Further, the court can "set aside" an ALJ's determination that fails "to mention and refute some of the contradictory medical evidence before him."  *Id.* at 121.  Ultimately, the ALJ "may properly accept some parts of the medical evidence and reject other parts, but . . . must consider all the evidence and give some reason for discounting the evidence [the ALJ] rejects."  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).

## V.   Discussion

The magistrate judge found that the ALJ's decision finding Ray not disabled lacked substantial evidence because, in determining RFC, the ALJ improperly rejected the medical opinion of Dr. Diamond, failed to obtain additional diagnostic testing of Ray's condition, and posed a hypothetical that incompletely characterized Ray's condition.  The Commissioner objects to the R&R because the ALJ had substantial evidence for: (1) denying Dr. Diamond's opinion

probative weight, (2) refusing requests for additional diagnostic testing, and (3) posing a

hypothetical that assumed Ray could perform light exertional work.  Ray argues that the court

should adopt the R&R because Dr. Diamond's report contains relevant, probative evidence and

because additional testing would provide evidence necessary for the ALJ to make a decision

supported by substantial evidence.[26]

---

[26]  Some confusion exists concerning the terminology that characterizes the weight the
ALJ gave to Dr. Diamond's report.  The ALJ declined to give Dr. Diamond's report "great or
controlling weight."  (R. 22.)  In requesting review, Ray argued the ALJ failed to give "adequate
weight" to that report.  (Pl.'s Br. and Statement of Issues in Supp. of Req. for Review 3.)  In
response, the Commissioner argued against giving Dr. Diamond's report "great weight."  (Def.'s
Resp. to Req. for Review of Pl. 6.)  The magistrate judge determined that the ALJ afforded Dr.
Diamond's report "little weight."  (R&R 11.)  In objecting to the R&R, the Commissioner argues
that the ALJ properly declined to give Dr. Diamond's report "great" or "probative" weight, using
the terms interchangeably.  (Def.'s Objection to the "Report and Recommendation" 3-5, 8-9, 12)

The terms controlling weight, great weight, and probative weight are not defined in the
relevant statutes, regulations, or Social Security Reports.  *See, e.g.*, 20 C.F.R. 404.1527(d)(2)
(providing no definition of "controlling weight," but requiring adjudicator to give "controlling
weight" to treating physician's opinion if "well-supported by medically acceptable clinical and
laboratory and diagnostic techniques and not inconsistent with other substantial evidence"); *see
also Plummer*, 186 F.3d at 429 (not defining term "great weight," but stating that adjudicator
should give "great weight" to treating physician's opinion).  Nevertheless, some courts have
hinted as to the meaning of "great weight."  Specifically, where evidence, usually a medical
opinion, receives great weight, the adjudicator cannot disregard that evidence, *Loza v. Apfel*, 219
F.3d 378, 395 (5th Cir. 2000) (criticizing ALJ's decision for disregarding evidence that deserved
"great weight"); *Hutton v. Apfel*, 175 F.3d 651, 659 (8th Cir. 1999) (concluding ALJ erred in
disregarding opinion that deserved great weight), unless the ALJ has persuasive contrary
evidence, *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987), or the evidence lacks support
from medically acceptable clinical or diagnostic data, *Hutton*, 175 F.3d at 659.  *See also Smolen
v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (ALJ must give great weight to treating physician
opinion "unless he makes findings setting forth specific, legitimate reasons for doing so that are
based on substantial evidence in the record"); *Moyer v. Shalala*, 828 F. Supp. 354, 359 (E.D. Pa.
1993) (granting great weight to treating physician opinion and abiding by opinion in absence of
persuasive contrary evidence).  Evidence that does not deserve great weight does not necessarily
deserve no weight at all.  *See Edlund v. Massanari*, 253 F.3d 1152, 1158 (9th Cir. 2001)
(concluding ALJ need not "simply disregard" opinions contrary to opinion given great weight).

Ultimately, the distinctions may present only academic concerns.  "[I]n the vast majority

A.      Dr. Diamond's Report

In concluding that the ALJ provided insufficient explanation for the weight given to Dr. Diamond's report,[27] the magistrate judge determined that the ALJ erred in: (1) finding Ray's treatment notes from the clinic inconsistent with Dr. Diamond's opinion, (2) relying on the absence of diagnostic testing, and (3) overlooking the full extent of Ray's pain medication regimen.

The Commissioner argues that the ALJ properly declined to give Dr. Diamond's report great or controlling weight because the report contradicted other evidence in the record, specifically, notes from Ray's treating physician, Ray's conservative treatment regimen, and inconsistencies in Dr. Diamond's report.  Ray contends that because Dr. Diamond's report provides great detail about Ray's condition, more so than any other evidence in the record, the report deserves greater weight than the ALJ gave it.  Because the ALJ did not sufficiently explain

---

of cases in which substantial evidence is an issue, a district court judge is faced with a unique combination of facts that can be resolved only through judicial experience and exercise of discretion.  In these instances, there is little guidance that the courts of appeals can provide by way of a generalized rule."  Hon. Morton Denlow, *Substantial Evidence Review in Social Security Cases as an Issue of Fact*, 28 J. Nat'l Ass'n Admin. L. Judiciary 29, 56 (2008).

[27] No issue exists as to whether Dr. Diamond's report deserves controlling weight, a special status granted by the ALJ to certain medical opinion evidence.  *See* 20 C.F.R. § 416.1527(d)(2) (providing criteria for granting controlling weight to opinion of treating physician).  Although at one point Ray argued for having Dr. Diamond's thorough medical evaluation of Ray's physical disabilities considered "the basis" for determining Ray's RFC, (Pl.'s Br. & Statement of Issues in Supp. of Req. for Review 4, 5), Ray no longer appears to contend that it deserves "controlling" weight.  Instead, the parties dispute whether Dr. Diamond's findings deserve "probative weight."  (Def.'s Objection to the "Report and Recommendation" 4.)  Nevertheless, in the R&R, the magistrate judge declined to give controlling weight to Dr. Diamond's determination of Ray's RFC, (R&R 10), as the judge found RFC a determination reserved for the Commissioner, *see* 20 C.F.R. §§ 404.1527(e), 416.927(e) (identifying RFC determination as issue reserved to Commissioner).

any of his three stated reasons for discrediting Dr. Diamond's report—its inconsistency with the clinic treatment notes, its lack of diagnostic testing, and its inconsistency with Ray's treatment regimen, the court will adopt in part the recommendation of the magistrate judge.

Under Social Security regulations, an adjudicator must weigh all medical opinion evidence,[28] such as Dr. Diamond's report, using these factors: (1) whether the physician has examined the claimant; (2) whether the physician has a treatment relationship with the claimant; (3) the degree of explanation and support, including medical signs and laboratory findings, for the opinion; (4) the consistency of the opinion with the record; (5) whether the physician has a relevant specialization. *Id.* §§ 404.1527(d); 416.927(d). Because of the close relationship a treating physician has with the patient, the ALJ generally gives more weight to a treating physician's report, but the ALJ must have "good reasons" for whatever weight a treating physician's opinion receives. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Moreover, "the ALJ must weigh the relative worth of a treating physician's report against the reports submitted by other physicians who have examined the claimant." *Adorno*, 40 F.3d at 48.

The ALJ may also flat-out reject any medical opinion contradictory to evidence in the record, *cf. Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (rejecting treating physician's opinion that contradicted medical evidence in record), or inadequately supported by clinical data, *cf. Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985) (rejecting treating physician's opinion because it lacked support of clinical data).

### 1.    Treatment notes from Ray's physicians

---

[28] Medical opinion evidence refers to "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

The ALJ did not sufficiently explain his decision to decline to give great weight to Dr. Diamond's report, as the decision relied too heavily on Ray's treatment notes from the clinic, evidence that has inherent weaknesses.[29]  On many occasions, the treating physician noted a diagnosis, such as arthritis, that aligned with Ray's symptoms of pain, but did not note any musculoskeletal problems on the physical examination checklist.  (*See, e.g.*, R. 80, 81, 83, 88, 107.)  Other times, the treating physician made consistent notations concerning Ray's reported symptoms, the physician's diagnosis, and the results of the physical exam.  (*See, e.g.*, R. 85-87, 90.)  Further, the same physician did not always complete the form noting Ray's condition at the visit.  (*Compare* R. 80-83, 109-09 *with* R. 84-93.)  These irregularities limit the weight the ALJ can properly attribute to Ray's medical records.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (listing consistency as factor affecting weight given to physician's report).  On top of these irregularities, the treatment notes amount to little more than checklists and filled-in blanks on a form.  (R. 80-109)  Given that "[f]orm reports," which require a physician "only to check a box or fill in a blank," constitute "weak evidence at best," *Mason*, 994 F.2d at 1065, the ALJ provided insufficient explanation as to how Ray's treatment notes justified limiting the weight of Dr. Diamond's opinion.

Furthermore, contrary to the ALJ's conclusion, Dr. Diamond's report is largely consistent with Ray's treatment notes.  (R. 22.)  Opinions are "consistent" when they are "marked by agreement and concord . . . showing no noteworthy opposing, conflicting, inharmonious, or contradictory qualities."  *Webster's Third New Int'l Dictionary* 484 (1981).  Ray's treatment

---

[29]  Although the ALJ relied on the treatment notes to justify not giving great weight to Dr. Diamond's report, (R. 22), the ALJ did not similarly assess, or even declare, what weight he gave to the treatment notes themselves.

notes attest to periods of joint pain often diagnosed as arthritis and significant enough to warrant

prescription medication.  (R. 80-81, 83, 85-90, 107-08.)  Dr. Diamond's report similarly

describes a specific period of Ray's arthritic pain that too requires medication to treat.  (R. 112-

17.)  Because both the treatment notes and Dr. Diamond's report document episodic pain, Dr.

Diamond's report accords with, rather than contradicts, notes from Ray's treating physician.  In

not accounting for the consistency between Dr. Diamond's report and the treatment notes, the

ALJ provided insufficient explanation for discrediting the report.

  The ALJ also did not sufficiently explain how the absence of identified physical

limitations in Ray's treatment notes justified not giving great weight to Dr. Diamond's

conclusion that Ray had limitations for sitting, lifting, carrying, standing, walking and other

postural activities.  (R. 22.)  The mere absence of an assessment of limitations in the treatment

notes does not render these notes inconsistent with Dr. Diamond's report.  *See Chrupcala v.

Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) (concluding that one physician's finding of no

serious orthopedic impairments in claimant not inconsistent with other physician's diagnosis of

arthritis, pain, and limited range of motion).  Thus, Dr. Diamond's assessment of Ray's

limitations as to sitting, lifting, carrying, standing, walking and other postural activities appears

to present no inconsistency with Ray's treatment notes, despite the ALJ's conclusion to the

contrary.  Because the ALJ improperly relied on the absence of limitations, the ALJ insufficiently

explained the decision not to give Dr. Diamond's report great weight.

  Furthermore, the ALJ cannot "interpret this silence [about limitations in Ray's treatment

notes] as affirmative evidence" that the treating physician found no limitations on Ray's RFC.

*Allen v. Bowen*, 881 F.2d 37, 42 (3d Cir. 1989).  Instead, the "proper inference from silence

about [RFC] in [a treating] physician's report is that the issue was not considered." *Mac v. Sullivan*, 811 F. Supp. 194, 201 (E.D. Pa. 1993) (citing *Allen*). This inference becomes especially proper in light of both the detail in Dr. Diamond's report and Ray's testimony about her limited abilities. *See Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985) (finding silence on how impairments affected work ability insufficient to overcome assessment of treating physician and testimony of claimant). Because Ray's treatment notes from the clinic contain no clinical testing or discussion of Ray's limitations, the ALJ should have inferred that the treating physicians merely did not consider these limitations. Therefore, in relying on the absence of clinical findings from Ray's treating physicians, the ALJ did not adequately explain the decision to decline to give great weight to Dr. Diamond's report. *Benton*, 820 F.2d at 88 (requiring ALJ to explain adequately reasons for discrediting evidence).

In conclusion, the ALJ did not fully explain how Ray's sparse treatment notes supported not giving great weight to Dr. Diamond's report and his extensive clinical examination. As required, the ALJ weighed the "relative worth" of Ray's treatment notes against Dr. Diamond's report. *Adorno*, 40 F.3d at 48. Indeed, the ALJ could have properly explained the decision not to give great weight to Dr. Diamond's report with evidence that the report was inconsistent with or contradictory to other medical evidence or lacked supporting data. *See Bomentre v. Barnhart*, Civ. Act. No. 04-5223, 2008 WL 1815330, at *3 (E.D. Pa. Apr. 18, 2008) (citing *Frankenfield* and *Newhouse* and applying their standards to evaluation of non-treating physician report); *Mays v. Barnhart*, 227 F. Supp. 2d 443, 448 (E.D. Pa. 2002) (same). But in relying on Ray's treatment notes, the ALJ overlooked that those notes contained irregularities, did not contradict Dr. Diamond's report, and ignored Ray's exertional limitations. Because the ALJ did not explicitly

24

show that Dr. Diamond's report contradicted the treatment notes or otherwise lacked clinical

support, the ALJ did not fully justify the decision not to give great weight to Dr. Diamond's

report.  *See Fargnoli*, 247 F.3d at 41 (requiring "clear and satisfactory explication" for basis of

RFC determination).

### 2.        Diagnostic testing

The magistrate judge concluded that the ALJ improperly decided not to give great weight

to Dr. Diamond's assessment based on the absence of imaging or electromyographic testing.  The

Commissioner contends that the ALJ could properly give limited weight to Dr. Diamond's

findings based on a lack of support from diagnostic testing.  Ray argues that this limitation was

improper because the ALJ himself failed to obtain the testing he found lacking.

Although in seeking evidence a claimant may request the ALJ to order a consultative

exam with diagnostic testing, the ALJ has the discretion to reject this request.  20 C.F.R. §§

404.1519a(a)(1), 404.1519m, 416.919a(a)(1), 416.919m.  Nevertheless, "[i]t is error for an ALJ

to refuse to obtain a complete consultative examination and then to deny benefits because the

record lacks the evidence such an examination could have produced," *Manning v. Sec'y of

Health & Human Servs.*, 881 F. Supp. 201, 204 (W.D. Pa. 1995), particularly "[w]here a claimant

suffers an impairment but cannot afford diagnostic studies or treatment," *Diller v. Bowen*, 654 F.

Supp. 628, 630 (W.D. Pa. 1987).

Here, the Social Security Administration denied Ray's request for a consultative exam

and related testing.  (R. 126.)  Furthermore, Ray could not afford electromyography and other

diagnostic testing.  (R. 84, 86, 148.)  Nevertheless, the ALJ did not give great weight to Dr.

Diamond's report because his "clinical findings lacked support from any imaging or

electromyographic test findings establishing the nature and extent of any [relevant]

abnormalities." (R. 22.) Given that Ray could not afford testing and the ALJ rejected her

requests for testing, the ALJ clearly erred in using the very absence of testing to limit the weight

of Dr. Diamond's report and thus deny Ray benefits. *Manning*, 881 F. Supp. at 204; *Diller*, 654

F. Supp. at 630. Because of this error, the ALJ relied on an insufficient explanation for not

giving great weight to Dr. Diamond's report.

### 3. Treatment regimen

The magistrate judge determined that the ALJ's decision to discredit Dr. Diamond's

report improperly relied on Ray's treatment regimen, because the ALJ disregarded Ray's use of

prescription medicine and cited only her use of non-prescription Tylenol. (R. 22.) The

Commissioner argues that because Ray only intermittently used prescription pain medication and

no other treatments for her condition, the ALJ properly concluded that this minimal treatment

regimen contradicted Dr. Diamond's findings. Ray responds by reference to the R&R.

As noted above, the ALJ determines the proper weight to give a medical opinion based on

its consistency with other evidence in the record. 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4).

On several occasions, the Third Circuit has affirmed the use of evidence of a claimant's

treatment regimen as illustrative of the scope of the claimant's condition and thus a proper basis

for rejecting a non-controlling medical opinion inconsistent with that condition. *See, e.g.*, *Salles

v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148-49 (3d Cir. 2007) (rejecting medical opinion

supporting disability because contradicted by claimant's moderate treatment regimen and

inconsistent breathing problems); *see also Green v. Comm'r of Soc. Sec.*, 266 F. App'x 125, 128

(3d Cir. 2008) (finding claimant's successful, moderate treatment regimen constituted substantial

26

evidence for RFC determination and implicitly supported rejection of contrary medical opinion).

Already taking medication for her hypertension and diabetes, Ray testified she pursued a less than fully aggressive treatment regimen for her joint pain, not because she had only mild pain, but rather because she feared mixing too many medications.  (R. 144, 149.)  Furthermore, on several occasions, Ray received powerful medications for severe pain, including Vicodin, Percoset, Bextra, and Celebrex, not just non-prescription Tylenol.  (R. 80, 83, 88, 90, 107; R&R 4.)  Because the ALJ overlooked both the non-condition related reasons underlying Ray's treatment regimen and the instances of more than moderate medication, the ALJ failed his duty to account for all evidence and explain contradictory evidence.  *Burnett*, 220 F.3d at 121 (ruling ALJ must explain contradictory evidence); *Ventura*, 55 F.3d at 902 (noting ALJ required to develop "full and fair record").  Moreover, the court cannot tell whether this evidence was "not credited or simply ignored."  *Cotter*, 642 F.2d at 705.  Due to this incomplete view of Ray's treatment regimen, the ALJ could not conclude that it completely and accurately reflected Ray's condition.  *Cf. Salles*, 229 F. App'x at 148-49.  Because the ALJ failed to account for aspects of Ray's treatment regimen probative of her condition, the ALJ insufficiently explained how the treatment regimen justified the decision to not give great weight to Dr. Diamond's report.  *See Rivera v. Astrue*, Civil No. 07-1912, slip op. at 29-34, 2008 WL 3285850, at *14 (D.N.J. Aug. 8, 2008) (finding that ALJ must explain probative evidence that conflicts with ALJ's decision to give little weight to medical report that contradicts ALJ's RFC determination).

> **4.    The ALJ did not adequately explain his reasons for limiting weight of Dr. Diamond's report**

In denying great weight to Dr. Diamond's assessment, the ALJ failed to explain

sufficiently any of his reasons—inconsistency with treatment notes, lack of diagnostic testing,

and Ray's moderate treatment regimen.[30]  Because the ALJ credited the treatment notes

improperly, relied on the absence of diagnostic testing, and overlooked Ray's use of prescription

pain medication, the ALJ failed to provide "a clear and satisfactory explication of the basis" for

discrediting Dr. Diamond's report in reaching her RFC determination.  *Fargnoli*, 247 F.3d at 41.

For the same reasons, the ALJ failed to resolve any ambiguities between Dr. Diamond's report

and the rest of the record, even though SSA policy requires him to do so for any RFC

determination.  S.S.R. 96-8p.  Due to the ALJ's slim and insufficient explanations, the ALJ failed

to justify the decision to reject, at least in part, Dr. Diamond's report.  *Benton*, 820 F.2d at 88.

Thus, the decision comes too close to "bare conclusion" and certainly lacks substantial evidence

to support it.  *Burnett*, 220 F.3d at 119.

 Because the weighing of Dr. Diamond's report affected the ALJ's RFC determination and

in turn the final decision that Ray did not have a disability and did not deserve benefits, that final

decision likewise lacked substantial evidence.  *See Burnett*, 220 F.3d at 122-23 (finding that

ALJ's error in interpreting evidence made RFC determination unsound, and thus disability

decision lacked substantial evidence).  Therefore, the court will adopt the magistrate judge's

decision in the R&R to grant Ray's request for review and will remand the case to the ALJ to

evaluate more completely Dr. Diamond's findings and their significance as to Ray's RFC.  *See*

*Burnett*, 220 F.3d at 126 (remanding case for ALJ to provide further explanation of decision,

---

[30]  The parties also dispute whether Dr. Diamond's report is consistent with Ray's testimony and statements and thus not worthy of great weight.  Because neither the ALJ nor the magistrate judge expressly pointed to inconsistency with Ray's testimony and statements as a reason not to give Dr. Diamond's report great weight, the court will not consider the issue.

which court found incomplete); *Eleleth v. Astrue*, Civ. Act. No. 07-1479, slip op. at 29, 2008 WL 3887670, at *10 (E.D. Pa. Aug. 21, 2008) (concluding remand proper where ALJ fails to provide clear explanation of analysis underlying decision).

**B.     The ALJ's Decision Against a Consultative Examination and Additional Testing**

The magistrate judge found that the ALJ properly exercised his discretion in deciding not to order a consultative examination ("CE") of Ray, but that on remand the ALJ should obtain additional diagnostic testing.  The Commissioner objects to additional testing because neither Ray's treating physicians nor Dr. Diamond found that Ray needed further testing.[31]  In her request for review, Ray pointed to the ALJ's obligation to develop a full record.

The ALJ has discretion to order that a claimant receive a CE, defined as "a physical or mental examination . . . from a treating source or another medical source."  20 C.F.R. §§ 404.1519, 416.919.  As part of the CE, the ALJ can also order diagnostic tests and procedures, unless they pose a risk to the claimant.  *Id.* §§ 404.1519m, 416.919m.  Generally, the ALJ can order these procedures (CE and diagnostic testing) "when the evidence as a whole . . . is not sufficient to support a decision on [a] claim."  20 C.F.R. §§ 404.1519a(b), 416.919a(b).

Against this discretionary standard for ordering these procedures lies the ALJ's "duty to

---

[31]   The Commissioner argues that the limited number and type of testing in Ray's treatment records reflects the relative moderate nature of Ray's condition and thus the ALJ did not need to order additional testing.  The ALJ, however, never offered that reason for declining to order diagnostic testing.  Because the court may only evaluate the reasons and conclusions of the ALJ, not the Commissioner's post-hoc rationalizations, the Commissioner's argument fails.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *Forsythe v. Astrue*, 2008 WL 4683436, at *4 (W.D. Pa. 2008) (noting "post-hoc justifications [from Commissioner] clearly contradict established precedent" concerning what court can consider in review of ALJ decision and citing *Chenery*).

develop a full and fair record in social security cases." *Ventura*, 55 F.3d at 902; *see also Irwin v. Barnhart*, Civ. A. No. 04-1007, 2005 WL 441358, at *3 (E.D. Pa. Feb. 22, 2005) (noting "it is incumbent upon the Commissioner to secure enough evidence to make a sound determination in SSI cases").  Thus, the ALJ must order a consultative exam where it is "*necessary* to enable the administrative law judge to make the disability decision."  *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam) (emphasis in original and quotations and citations omitted).  Circumstances that require a consultative examination include: (1) when a claimant's medical records do not contain needed additional evidence or (2) when the ALJ needs to resolve a conflict, inconsistency, ambiguity, or insufficiency in the record.  20 C.F.R. § 404.1519a(b)(2), (4); 20 C.F.R. § 416.919a(b)(2), (4); *see also Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001) (finding consultative exam "normally require[d]" where ALJ needs "additional evidence" not in medical source records or where "ambiguity or insufficiency" in record prevents resolution of case (quotations and citations omitted)).

"Even where medical testimony is ambiguous, [the] Court must defer to the ALJ's decision not to purchase a consultative exam when [it] finds that the record contains sufficient evidence to make a decision."  *Bomentre*, 2008 WL 1815330, at *3.  Although the above standards speak directly to obtaining a CE, because they derive from an ALJ's duty to develop a full records, the apply with equal force to diagnostic testing.  *See Sherman v. Astrue*, Civ. A. No. 07-306, slip op. at 14, 2008 WL 4858289, at *10 (W.D. Pa. Nov. 10, 2008) (requiring ALJ to explain reasons for discrediting portion of medical opinion that lacked diagnostic testing, but permitting ALJ to seek "additional evidence" if "necessary").

Diagnostic testing seems warranted under both of the above factors, especially where, as

30

here, the ALJ's final disability decision relied on the absence of testing, which the ALJ denied to

the claimant and the claimant could not afford on her own.  *See Manning*, 881 F. Supp. at 204;

*Diller*, 654 F. Supp. at 630.  Concerning the need for additional information, not only on two

occasions did Ray's treating physicians prescribe an EMG test once Ray had insurance, (R. 84,

86), but Ray herself also requested diagnostic testing, (R. 148).  Dr. Diamond also recommended

that EMG testing would at least "rule out Carpal Tunnel Syndrome."  (R. 112.)  These

prescriptions, request, and recommendation together suggest that the medical records lacked

additional evidence of Ray's condition that testing could have provided.  Turning to the

ambiguity that testing could resolve, Ray's treatment notes contain several diagnoses of medical

conditions possibly causing Ray's reported pain, including arthritis, fibromyalgia, arthralgia, and

bilateral carpal tunnel syndrome.  (R. 19, 80, 81, 83, 86, 90, 107.)  Of these conditions, Dr.

Diamond's report also diagnosed Ray with two of them, arthritis and arthralgia, in making his

detailed evaluations of Ray's physical capacities.  Because the treatment notes and Dr.

Diamond's report both evaluate Ray's pain over different periods and in different detail and

because both reach similar, but not identical, conclusions, they present an ambiguous portrayal of

Ray's condition.

In light of the need for additional evidence and the ambiguity in the record, diagnostic

testing seems required here to provide objective medical evidence dispositive of the extent of

Ray's abilities and thus to resolve Ray's claim.  *Reed*, 270 F.3d at 842; 20 C.F.R. §

404.1519a(b)(2), (4); 20 C.F.R. §§ 416.919a(b)(2), (4).  Nevertheless, nothing in the record

suggests that the ALJ considered whether diagnostic testing was "necessary to enable [him] to

make the disability decision."  *Jones*, 829 F.2d at 526 (quotations and citations omitted); *see*

31

*Bomentre*, 2008 WL 1815330, at *3 (affirming ALJ's decision to not order CE because ALJ explained decision and made it in due consideration of record).  Because the situation plainly warranted diagnostic testing, because the ALJ did not expressly consider it, and because Ray could not afford the testing herself, the ALJ's decision to not order diagnostic testing lacked substantial evidence or explanation.  On remand, the ALJ should either order diagnostic testing or explain how his decision requires no additional evidence or explanation.

### C.    Vocational Expert

The magistrate judge found that because the ALJ's hypothetical to the VE excluded, without explanation, details from Dr. Diamond's findings, the ALJ lacked substantial evidence to conclude, based on the VE's response, that Ray did not have a disability.  The Commissioner argues that the ALJ properly denied Dr. Diamond's report great weight and, based on this weighting, posed a proper hypothetical to the VE.  Ray agrees with the magistrate judge's rejection of both the ALJ's hypothetical and the resulting VE testimony.

In performing step five of the disability analysis, the ALJ, may, and quite often does, ask a VE's opinion, by way of a hypothetical question, of the available jobs in the national economy that the claimant can perform based on the claimant's alleged RFC.  *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).  The ALJ can consider "the vocational expert's testimony . . . for purposes of determining disability if the [hypothetical] question [from the ALJ] *accurately* portrays the claimant's individual physical and mental impairments . . . as contained in the record."  *Podedworny*, 745 F.2d at 218 (citation omitted and emphasis added).  As a result, the hypothetical question posed to the VE must "reflect *all* of a claimant's impairments," *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002) (quotation and citation omitted and emphasis in

original), that are "credibly established," *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir.

2005).  Where a hypothetical excludes "medically supported and otherwise uncontroverted"

limitations, the ALJ may not rely on the VE's testimony.  *Rutherford*, 399 F.3d at 554.

Here, the ALJ's step five analysis relied on testimony from a VE given in response to the

ALJ's hypothetical.  (R. 23.)  The hypothetical asked the VE to assume Ray could perform light

duty work and to consider her education, age, and prior work.[32]  (R. 23, 151.)   The VE listed

several jobs that Ray could perform, including cashier, locker room attendant, and office helper,

all of which involve reaching, fingering, and handling.  (*Id.*)  Dr. Diamond's report, however,

included reaching, fingering, and handling among Ray's physical limitations and supported this

finding with clinical diagnostic testing that showed Ray suffered from reduced grip strength and

deQuervain's syndrome.  (R. 111, 115.)  The medical records of the clinic treating Ray did not

deal with these issues at all.  (R. 80-99, 106-09.)  Finally, as noted above, the ALJ declined to

give Dr. Diamond's report great weight based on the absence of evidence, not the presence of

conflicting evidence.  *See*, *supra*, Part V.A.5.

Without conflicting evidence in the record, not merely the absence of either limitations

assessed in Ray's medical records or other support for Dr. Diamond's report, the ALJ could not

justifiably exclude from the hypothetical Ray's limitations of reaching, fingering, and handling,

that were credibly established by objective medical evidence in Dr. Diamond's report.  20 C.F.R.

§§ 404.1529(c)(3)-(4), 416.929(c)(3)-(4) (requiring ALJ to have conflicting evidence in the

record, not merely an absence of objective medical evidence, to exclude a claimant's limitation

---

[32]  The ALJ also asked the VE about available jobs for Ray assuming the VE gave full credit to Dr. Diamond's assessment of Ray's abilities.  (R. 151.)  The VE testified that in that case Ray would not be able to perform full-time work.  (*Id.*)

from consideration); *cf. Johnson*, 529 F.3d at 206 (affirming ALJ's exclusion of claimant's alleged limited grasping capabilities because ALJ had overwhelming, conflicting record evidence of claimant's hand strength). Because the ALJ's hypothetical did not account for all of Ray's "credibly established" limitations, the hypothetical did not accurately portray Ray's impairments, and thus the ALJ could not rely on the VE's testimony. *See Rutherford*, 399 F.3d at 554 (requiring ALJ to present all credible limitations to VE for ALJ to rely on VE's opinion). Consequently, to the extent the ALJ relied on the VE's testimony to determine that Ray did not qualify as disabled, the ALJ lacked substantial evidence for that decision. Thus, the court will adopt the conclusion of the magistrate judge that the ALJ improperly excluded Dr. Diamond's findings in the hypothetical used in the ALJ's step five analysis. On remand, the court will require the ALJ either to provide evidence to justify excluding Ray's reaching, fingering, and handling limitations or to include these limitations in any hypothetical to a VE.

**VI.   Conclusion**

For the above reasons, the ALJ lacked substantial evidence for (1) denying great weight to Dr. Diamond's report, (2) declining to order diagnostic testing, and (3) posing a hypothetical to the VE that did not account for all of Ray's established limitations. Each of these decisions affected the ALJ's determination of Ray's RFC and thus the final determination that Ray did not have a disability and could not receive benefits. Consequently, that final decision lacked substantial evidence to support it. Therefore, the court will adopt the conclusions of the magistrate judge and remand this matter to the ALJ for further consideration consistent with this memorandum.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THERESA RAY,                              :
           Plaintiff,            :        CIVIL ACTION
                                 :
   v.                                  :        NO. 07-4378
                                 :
MICHAEL J. ASTRUE, COMMISSIONER           :
OF SOCIAL SECURITY,                       :
           Defendant.            :
                                 :

## Order

**AND NOW**, this 7th day of January 2009, upon consideration of plaintiff Theresa Ray's Request for Review, the Commissioner's Response to Request for Review, and plaintiff's Reply thereto, and after careful and independent review of the magistrate judge's Report and Recommendation (Doc. No. 12) and the Commissioner's objections thereto, and plaintiff's response to objections, it is hereby **ORDERED** that:

1.    The Commissioner's objections are **OVERRULED**.

2.    The conclusions in the Report and Recommendation of United States Magistrate Judge are **APPROVED** and **ADOPTED** in part and **DENIED** in part.

3.    The matter is **REMANDED** to the Commissioner of the Social Security Administration to allow the Administrative Law Judge ("ALJ") to conduct further proceedings consistent with the accompanying memorandum.  Specifically, on remand, the ALJ must: (1) properly explain the weight given Dr. Diamond's findings or give those findings greater weight; (2) properly explain the reasons for denying additional diagnostic testing or provide such testing; (3) properly explain the failure to include all of Ray's impairments in the hypothetical to the VE or

rely on a new hypothetical to a VE that includes all of Ray's impairments.

4.      Judgment is entered for plaintiff Theresa Ray and against defendant

Commissioner of the Social Security Administration to the extent set forth in the

accompanying memorandum.


                                                   s/ William H Yohn Jr., Judge
                                                  William H. Yohn Jr., Judge